IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

DEC 1 3 2004

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| ROBERT SPILAR, | § | |
| | § | **H-04-4664** |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. _____ |
| | § | |
| | § | |
| XEROX CORPORATION, WILLIAM | § | |
| COLLINS and RALPH KELLEY, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT XEROX CORPORATION'S NOTICE OF REMOVAL UNOPPOSED BY CO-DEFENDANTS WILLIAM COLLINS AND RALPH KELLEY

XEROX CORPORATION, Defendant in the above-styled and numbered cause, submits this Notice of Removal pursuant to the provisions of 28 U.S.C. §§ 1441 and 1446 and as cause therefore would show the Court as follows:

1.     Defendant Xerox Corporation ("Defendant") was sued in a civil action pending in the 281st Judicial District Court of Harris County, Texas, styled *Robert Spilar v. Xerox Corporation, William Collins and Ralph Kelley*, Cause No. 2004-60984. A copy of Plaintiff's Original Petition and First Amended Petition, both filed with the State Court, are attached to this Notice, are incorporated herein by reference, and are made a part of this Notice of Removal.

2.     Plaintiff's Original Petition was filed on October 29, 2004. Defendant was served with Plaintiff's Original Petition on November 24, 2004. Therefore, this Notice of Removal is timely filed under 28 U.S.C. § 1446(b), within thirty days of receipt of the initial pleading setting forth a claim for relief. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 119 S. Ct. 1322, 1328-29 (1999).

3.      Co-Defendant Ralph Kelley was served with Plaintiff's Original Petition on November 15, 2004, and Co-Defendant William Collins was served with Plaintiff's Original Petition on December 9, 2004.

4.      On November 15, 2004, Plaintiff filed his First Amended Petition with the State Court.

5.      This suit involves a controversy arising, if at all, under the laws of the United States, over which the District Courts of the United States have original jurisdiction pursuant to the provisions of 28 U.S.C. § 1331, and it is one that may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. § 1441(b).  The above-entitled action is a civil suit alleging, *inter alia*, a state law claim for breach of contract and damages wherein Plaintiff seeks to recover disability benefits from Defendant. *See Plaintiff's First Amended Petition at pp. 22-24.*  Defendant provides disability benefits to its employees through Xerox Corporation's Disability Income Program, which includes benefits under Xerox's short-term disability program, as well as Xerox's Long-Term Disability Plan, which is comprised of three separate plans:  the Xerox Corporation Long-Term Disability Income Plan, the Xerox Corporation Extended Long-Term Disability Income Plan, and the Xerox Corporation New Hire Long-Term Disability Plan (collectively, the "Long-Term Disability Plan" or the "Plan"). *See Affidavit of Linda Maksimowicz ¶¶ 2-3 (Tab 7).*  Xerox's Long-Term Disability Plan is an employee welfare benefit plan as defined by the Employee Retirement Income Security Act ("ERISA"). *See id. ¶ 2; Disability Summary Plan Description at p. i (Tab 7A).*  Plaintiff's state law claim and alleged damages necessarily depend upon and will require the Court to analyze and interpret the provisions of the Plan.  Because the Plan is an employee welfare benefit plan under ERISA and since Plaintiff's claim and damages relate to the employee welfare benefit plan, Plaintiff's state law claim is preempted by ERISA and removable by Defendant. *See Metropolitan Life Ins. Co.*

- 2 -

*v. Taylor,* 481 U.S. 58, 62-63, 67 (1987) (holding that state causes of action filed in state courts that are preempted by ERISA are removable to federal court even though ERISA does not appear on the face of the complaint since such cases are "necessarily federal in character by virtue of the clearly manifested intent of Congress.")

6.      The Plan from which Plaintiff seeks to recover disability benefits is an employee welfare benefit plan governed by ERISA. *See, e.g.,* 29 U.S.C. §§ 1002(1)(A) and 1003(a). An "employee welfare benefit plan" is defined by ERISA as "any plan, fund, or program which is heretofore or hereafter established or maintained by an employer" to provide its participants or their beneficiaries with certain benefits including "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, <u>disability</u>, death or unemployment." 29 U.S.C. § 1002(1)(A) (emphasis added). <u>The U.S. Supreme Court has expressly held that disability benefit plans qualify as ERISA plans</u>. *See Pilot Life Ins. v. Dedeaux*, 107 S.Ct. 1549, 1551-53 (1987); *Metropolitan Life*, 481 U.S. at 59-63. The Plan at issue here is a plan that was established or maintained by Defendant to provide eligible employees with disability benefits, pursuant to the terms and conditions set forth in the Plan. *Affidavit of Linda Maksimowicz ¶ 2 (Tab 7); Disability Summary Plan Description (Tab 7A) at p. 1.* Robert Spilar's right to disability benefits, if any, is governed by the terms and conditions of Defendant's Disability Income Program, which includes benefits under Defendant's Long-Term Disability Plan. *Affidavit of Linda Maksimowicz ¶ 3 (Tab 7).* Thus, the Plan at issue here is clearly an employee welfare benefit plan governed by ERISA.

7.      While Plaintiff fails to plead his breach of contract claim against Defendant with any degree of specificity, *see Plaintiff's First Amended Complaint at p. 22*, it appears from a review of Plaintiff's pleading that Plaintiff's breach of contract claim is predicated on his assertion that he was wrongfully denied disability benefits. In any event, there can be no dispute

- 3 -

that Plaintiff claims that Defendant wrongfully denied him disability benefits pursuant to the

Company's disability benefit plans.  In this regard, Plaintiff makes the following claims in his

First Amended Petition with respect to Defendant's alleged denial of disability benefits:

a) "Mr. Spilar was disabled throughout his last thirty-four (34) months of employment with Xerox.  Xerox was aware of this disability that entire time." *Id. at p. 3.*

b) "Mr. Nicks further announced to Mr. Spilar that he would not be allowed to go on disability benefits and would 'stay on quota.'" *Id. at p. 6.*

c) "Since that time, in an effort to conceal its actions, Xerox has taken the position that it was Mr. Spilar's decision to decline disability coverage.  It is apparent from the facts that the decision was made by Xerox." *Id. at p. 6.*

d) "Had Xerox followed its own policy, Mr. Spilar would have awakened on the 9th day enjoying disability status with his employer, or at the very least, Xerox would have already initiated the process of determining eligibility for disability benefits." *Id at p. 7.*

e) "Xerox did not lift a finger to initiate disability benefits for Mr. Spilar." *Id. at p. 8.*

f) "Xerox policy is plain and clear as to when a disability claim is to be initiated:  '…when the employee informs you that he will be absent from work due to illness." *Id. at p. 8.*

g) "Although Mr. Spilar was never on disability benefits, of any kind or at any time, with Xerox, from 2001 through September 2004, Xerox placed other employees on disability benefits." *Id at p. 9.*

h) "The effect of Xerox's decision not to provide a disability benefit to Mr. Spilar . . . was to deny Mr. Spilar's legal rights, deny Mr. Spilar access to the same benefits of employment as other employees . . . ." *Id. at p. 9.*

i) " . . . Mr. Kelley did not initiate any effort to gain disability benefits status for Mr. Spilar, again, contrary to Xerox policy." *Id at p. 12.*

j) "This was the second time, from a hospital bed, that Mr. Spilar learned that he would not be placed on disability benefits." *Id. at p. 12.*

k) "Mr. Kelley took no action regarding disability benefits for Mr. Spilar." *Id. at p. 13.*

HOUSTON: 96923.00009: 968589v1

l)    Plaintiff also alleges that Defendant violated his civil rights by:

-    "Denying Mr. Spilar . . . disability benefits for his disability/disabilities in a discriminatory manner;

-    Interfering with Plaintiff's ability to receive . . . benefits for his disability. *Id. at pp. 23.*

8.    State law claims are preempted by ERISA where they relate to an ERISA employee welfare benefit plan. *McNeil v. Time Ins. Co.,* 205 F.3d 179, 191 (5th Cir. 2000) (employee's claims for breach of contract and common law discrimination were preempted by ERISA where the claims addressed the employee's right to receive benefits under an ERISA plan). ERISA expressly "supercede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. §1144(a); *see also Vega v. National Life Ins. Servs., Inc.,* 188 F.3d 287, 291 (5th Cir. 1999) ("ERISA preempts all state claims that 'relate to any employee benefit plan.'") (emphasis added). Specifically, ERISA preempts state law contract and tort claims for improper denial of disability plan benefits. *See Pilot Life Ins. v. Dedeaux,* 107 S.Ct. at 1551-53; *Metropolitan Life,* 481 U.S. at 59-63, 67. It is "well-established that the 'deliberately expansive' language of [ERISA's preemption provision] . . . is a signal that it is to be construed extremely broadly." *Corcoran v. United HealthCare, Inc.,* 965 F.2d 1321, 1328-29 (5th Cir. 1992); *see also California Div. Labor Standards Enforcement v. Dillingham Constr. N.A., Inc.,* 117 S. Ct. 832, 837 (1997) ("We have long acknowledged that ERISA's pre-emption provision is 'clearly expansive.'"); *FMC Corp. v. Holliday,* 498 U.S. 52, 58 (1990) (explaining that ERISA's "pre-emption clause is conspicuous for its breadth [and] establishes as an area of exclusive federal concern the subject of every state law that 'relate[s] to' an employee benefit plan governed by ERISA.").

9.    "A state law 'relates to' an employee benefit plan 'if it has a connection with or reference to such plan.'" *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.,* 295 F.3d

- 5 -

505, 515 (5th Cir. 2002). ERISA preempts a state law claim "if (1) the state law claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects the relationship between the traditional ERISA entities – the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Id.* In this lawsuit, Plaintiff asserts claims regarding his alleged right to receive disability benefits under Defendant's ERISA-governed disability benefit plan, and Defendant's refusal to provide him with benefits under that Plan. Thus, Plaintiff's state law claim in this case addresses areas of exclusive federal concern and is therefore preempted.

10.    Plaintiff's claim for disability benefits also directly affects the relationship between traditional ERISA entities (i.e., a plan participant and employer) and traditional ERISA-grounded responsibilities (such as, seeking and paying benefits). *Dial v. NFL Player Supplemental Disability Plan*, 174 F.3d 606, 611 (5th Cir. 1999); *Salameh v. Provident Life & Acc. Ins. Co.*, 23 F.Supp.2d 704, 717-18 (S.D. Tex. 1998).

11.    Furthermore, courts have held that preemption is necessary when a claim, such as Plaintiff's claim, requires an interpretation of an ERISA plan or will affect how the plan is administered. *See, e.g., Thibodeaux v. Continental Cas. Ins. Co.*, 138 F.3d 593, 596 (5th Cir. 1998) (holding that "ERISA preempts state decisional rules concerning contract interpretation"); *Hubbard v. Blue Cross & Blue Shield Ass'n*, 42 F.3d 942, 946 (5th Cir. 1995) (holding that when "such questions are intricately bound up with the interpretation and administration of an ERISA plan" the claim must be preempted); *Epps v. NCNB Texas*, 7 F.3d 44, 45 (5th Cir. 1993) (when a court must refer to an ERISA plan to determine the plaintiff's benefits and compute the damages claimed, the claim relates to an ERISA plan). In this case, Plaintiff's claim depends on the interpretation of an ERISA employee welfare benefit plan, thus further supporting ERISA preemption.

- 6 -

12.    Finally, "as a suit by a beneficiary to recover benefits from a covered plan," this lawsuit "falls directly under section 502(a)(1)(B) of ERISA, which provides an exclusive federal cause of action for resolution of such disputes." *Metropolitan Life Ins.*, 481 U.S. at 62-63 (emphasis added); 29 U.S.C. § 1132(a)(1)(B).  Thus, this lawsuit is completely preempted by ERISA and therefore properly maintained in federal court.  *See id.* at 63-67 (holding that common law causes of action filed in state court that are pre-empted by ERISA and come within the scope of § 502(a)(1)(B) are removable to federal court under 28 U.S.C. § 1441(b)).  As the Fifth Circuit explained, "ERISA's civil enforcement remedies were intended to be exclusive in order to prevent the remedies available to ERISA beneficiaries from being supplemented or supplanted by varying state laws." *Hogan v. Kraft Foods,* 969 F.2d 142, 144 (5th Cir. 1992). Because Plaintiff seeks to obtain the same relief as that provided for in Section 1132 of ERISA, his claims are completely preempted, notwithstanding that Plaintiff pled the claims as a state action.  *See Copling v. The Container Store*, 174 F.3d 590, 594 (5th Cir. 1999) ("Section 502, by providing a civil enforcement cause of action, completely preempts any state cause of action seeking the same relief, regardless of how artfully pled as a state action."), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir, 2003).  Indeed, claims such as Plaintiff's, which address the right to receive benefits under the terms of an ERISA plan, are an "area[ ] of exclusive federal concern." *Dial*, 174 F.3d at 611; *see also Metropolitan Life*, 481 U.S. at 63-67 (holding that causes of action within the scope of the civil enforcement provisions of Section 1132 should be regarded as arising under federal law and are removable, though plead as state law claims).

13.    Since the above-described action arises from and is under the purview of ERISA, 29 U.S.C. § 1001 *et seq.*, as amended, this Court has original jurisdiction of the action without

- 7 -

regard to the amount in controversy or diversity of citizenship pursuant to 29 U.S.C. § 1132(e); **the action may therefore be removed pursuant to 28 U.S.C. § 1441(b).**

14.     Plaintiff also asserts claims for defamation, conversion, violation of the Texas Theft Liability Act, intentional infliction of emotional distress, and violations of Chapter 21 of the Texas Labor Code. *See First Amended Petition at pp. 21-24.* 28 U.S.C. §1367(a) governs supplemental jurisdiction (formerly known as pendent jurisdiction) and explains that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a).  Plaintiff's other claims arise from the same case or controversy as his claim for disability benefits, in that the claims relate to Plaintiff's alleged disability, Plaintiff's employment with Defendant, and the termination of Plaintiff's employment with Defendant. Because Plaintiff's other claims are part of the same case or controversy as his claim for disability benefits, and since this Court has original exclusive jurisdiction under ERISA for Plaintiff's claim for disability benefits, this Court also has supplemental jurisdiction over Plaintiff's other claims and removal to this Court is proper.

15.     Defendant consents to removal, as do Co-Defendants William Collins and Ralph Kelley.

16.     Although Plaintiff has requested a jury trial, ERISA does not provide a right for a trial by jury. *See Borst v. Chevron Corp.,* 36 F.3d 1308, 1323-24 (5th Cir. 1994) (affirming the district court's decision to strike the plaintiff's jury demand stating that "ERISA claims do not entitle a plaintiff to a jury trial").  Thus, Plaintiff is not entitled to a jury trial on his claim for disability benefits.

17.     The State court has not signed any orders.

- 8 -

18.    Pursuant to Local Rule 81, Defendant has attached the following documents:

(1)    all executed process in this case;

(2)    all pleadings asserting causes of action, *e.g.*, petitions, counterclaims, cross-actions, third-party actions, interventions and all answers to such pleadings;

(3)    all orders signed by the state court judge;

(4)    the docket sheet;

(5)    an index of matters being filed; and

(6)    a list of all counsel of record, including addresses, telephone numbers, and parties represented.

19.    Under 28 U.S.C. § 1441(a), venue of the removed action is proper in this Court because the above-referenced action is pending in Harris County, Texas.

20.    Defendant will promptly give Plaintiff written notice of the filing of this Notice of Removal as required by 28 U.S.C. § 1446(d).  Defendant will also promptly file a copy of this Notice of Removal with the Clerk of the 281st Judicial District Court of the State of Texas, Harris County, where the action is currently pending, also pursuant to 28 U.S.C. § 1446(d).

HOUSTON: 96923.00009: 968589v1

WHEREFORE, PREMISES CONSIDERED, Defendant prays that the above action, now pending against it in the 281st Judicial District Court of Harris County, Texas, be removed to this Court.

Respectfully submitted,

By: _____

SCOTT K. DAVIDSON
Texas State Bar No. 24031990
S.D. Tex. ID No. 33037
600 Travis Street, Suite 3400
Houston, Texas 77002-3095
(713) 226-1305
(713) 223-3717 (Facsimile)

ATTORNEY IN CHARGE FOR
DEFENDANTS XEROX CORPORATION,
WILLIAM COLLINS, AND RALPH
KELLEY

OF COUNSEL:

LOCKE LIDDELL & SAPP LLP
WILLIAM JOHN BUX
Texas State Bar No. 03546400
S.D. Tex. ID No. 7396
LOCKE LIDDELL & SAPP LLP
600 Travis Street, Suite 3400
Houston, Texas 77002-3095
(713) 226-1275
(713) 223-3717 (Facsimile)

- 10 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of December, 2004, a true and correct copy of the foregoing document has been served upon counsel for Plaintiff by certified mail, return receipt requested with proper postage affixed and addressed as follows:

John Bruster Loyd
JONES, GILLASPIA & LOYD, L.L.P.
1400 Post Oak Blvd., Suite 800
Houston, Texas 77056

Scott K. Davidson

- 11 -

tab1

CAUSE NO. 200460984

RECEIPT  NO. 208116          50.00        C01
                10-29-2004                    TR # 71840044

PLAINTIFF: SPILAR, ROBERT                    In The  281st
    vs.                                      Judicial District Court
DEFENDANT: XEROX CORPORATION                 of Harris County, Texas
                                             281ST DISTRICT COURT
                                             Houston, TX

                              CITATION

THE STATE OF TEXAS
County of Harris

                              F I L E D
                        CHARLES BACARISSE
                          District Clerk

                          NOV 1 8 2004

                        Harris County, Texas

                    By                        Deputy

TO: KELLEY, RALPH
    XEROX CORPORATION
    5151 SAN FELIPE 11TH FLOOR  HOUSTON TX 77056


    Attached is a copy of PLAINTIFF'S ORIGINAL PETITION

This instrument was filed on the 29th day of October, 2004, in the above cited cause number
and court. The instrument attached describes the claim against you.

    YOU HAVE BEEN SUED,  You may employ an attorney.  If you or your attorney do not file a
written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday
next following the expiration of 20 days after you were served this citation and petition,
a default judgment may be taken against you.

TO OFFICER SERVING:
    This citation was issued on 2nd day of November, 2004, under my hand and
seal of said Court.


## CONSTABLE'S RETURN

Came to hand on the _12TH_ day of _NOVEMBER_ _____ A.D.,200_4_ at _11:03_ o'clock _A_ M

and executed in _HARRIS_ _____ County, Texas, by delivering to each of the within named defendants, in person

true copy of this Citation. together with the accompanying copy of _____

he following times and place, to wit:

| NAME | DATE | | | TIME | | | ADDRESS OF SERVICE |
|------|------|------|------|------|------|------|--------------------|
|      | MONTH | Day | YEAR | HOUR | Min | M |                |
| RALPH KELLEY | 11 | 15 | 04 | 10 | 50 | AM | 5151 SAN FELIPE 11TH FLOOR |
|      |      |      |      |      |      |      | HOUSTON, TX .77056 |

not executed as to the Defendant _____

tab 2

2004-60984

CAUSE NO. _____

| | | |
|---|---|---|
| ROBERT SPILAR | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff* | § | |
| | § | |
| | § | |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| XEROX CORPORATION, WILLIAM | § | |
| COLLINS and RALPH KELLEY | § | |
| | § | |
| *Defendants* | § | 281 JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff, Robert Spilar ("Spilar"), files this, his Original Petition, against Xerox Corporation ("Xerox"), William Collins ("Collins") and Ralph Kelley ("Kelley") and for cause of action would show the Court the following:

### PARTIES

**PLAINTIFF**

Robert Spilar is an individual residing in the City of Houston, County of Harris, State of Texas.

**DEFENDANTS**

Xerox is a foreign corporation doing business in the State of Texas on a systematic and continuous basis. Xerox maintains an agent for receiving service of process in the State of Texas, and may be served with citation by serving its registered agent for service of process, Prentice Hall Corporation System, 701 Brazos Street, Suite 1050, Austin, Texas 78701, a true copy of the citation

with a copy of Mr. Spilar's Original Petition attached thereto, pursuant to the applicable rules of procedure. Xerox was at all relevant times an employer within the meaning of the statutes.

Defendant Collins is an individual and resident of Dallas, Dallas County, Texas who may be served with process at his place of employment, Xerox Corporation, 8700 Freeport Parkway, Irving, Dallas County, Texas.

Defendant Kelley is an individual and resident of Missouri City, Fort Bend County, Texas who may be served with process at his place of employment, Xerox Corporation, 5151 San Felipe, 11th Floor, Houston, Harris County, Texas 77056.

## JURISDICTION

This lawsuit for damages is founded on violations of the Section 21 of the Texas Labor Code and common law actions. As such, this Court has original jurisdiction over this lawsuit.

This Court has personal jurisdiction over the Defendants by virtue of the extensive amount of business Defendants regularly conduct within the State of Texas and, further, because of the specific conduct at issue relating to Mr. Spilar. In addition, Defendants Kelley and Collins are residents of Texas. Defendants are amenable to service under the Texas long-arm statute, and exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

## VENUE

Venue is proper in this Court in that this Court sits in a district in which the Defendants reside, are found, have an agent, or transact their affairs. Venue is also proper in this Court pursuant to Texas Civil Practice and Remedies Code §15.001(a) and §15.002(a)(2) in that (a) Defendant Xerox is deemed to reside in this District because it is a corporation subject to personal jurisdiction in this District at the time this action is commenced; and (b) a substantial part of the events or omissions giving rise to Mr. Spilar's claims occurred in Texas and in this District.

## **PROCEDURAL REQUIREMENTS**

Plaintiff has filed charges of unlawful employment practices with the Equal Employment Opportunity Commission ("EEOC") raising the issues complained of herein.

Plaintiff has received a Notice of Right to Sue from the EEOC authorizing plaintiff to commence a civil action. Plaintiff has filed his petition within 60 days from the date he received his notices authorizing him to bring his actions.

## **NATURE OF THE CASE**

Mr. Spilar, a fifty-eight (58) year old man, was employed by Xerox from on or about September 1, 1997 through June 30, 2004, a period of over six (6) years. Mr. Spilar is disabled as a result of impairments that substantially limit major life activities. For years, Mr. Spilar has had such impairments. Mr. Spilar's impairments are permanent. Mr. Spilar was disabled throughout his last thirty four (34) months of employment with Xerox. Xerox was aware of his disability that entire time.

Mr. Spilar has a long history, and voluminous accompanying medical records, of disability. For years, Mr. Spilar has been regarded as having impairments by Xerox and others. Xerox managers, Mr. Spilar's friends that worked with him at Xerox and Mr. Spilar's co-workers at Xerox repeatedly, over the years, commented and expressed concern about Mr. Spilar's appearance, the effect of medications on him and their disbelief that he was working and not on leave for his disability.

Since August 2001, when he suffered his first heart attack, Mr. Spilar has been treated for severe cardiovascular disease, severe angina, hypertension, soreness, chest pain, fatigue and depression. By 2004, Plaintiff's health had deteriorated further, leading to another heart surgery in early February. In late February, his doctor reported to him that heart surgery was needed a third

time but not recommended as it might kill. Not much later, his doctor diagnosed him with diabetes. The growing list of impairments, and the obvious physical symptoms that accompanied them, were taking a terrible toll on Mr. Spilar, physically and mentally in his final months at Xerox.

Mr. Spilar developed emotional and mental health problems due to his physical disability, the abundance of medication prescribed to treat his physical condition, the medication prescribed to him to treat his mental conditions and the additional stresses of work brought on by the harassment, intimidation and interference of Xerox and Mr. Kelley.

Throughout Mr. Spilar's suffering from disability and his efforts to exercise his rights to gain help for his disability, Xerox initiated and conducted a long and continuous pattern of severe and pervasive offensive conduct related to his disability and efforts to seek help. In addition, Xerox initiated and conducted an ongoing, pervasive, malicious and willful pattern of interfering with Mr. Spilar's rights and retaliating against Mr. Spilar due to his disability and effort to seek help for his disability. Mr. Kelley continued and increased these practices as Mr. Spilar's manager. Since September 2001, Xerox has engaged in a pattern of conduct intended to deny Mr. Spilar his rights as a disabled person and interfere with Mr. Spilar's rights as a disabled person. Mr. Kelley continued and increased this conduct as Mr. Spilar's manager.

At the time of his termination, Mr. Spilar held the position of Document Solutions Executive. Throughout his tenure at Xerox, Mr. Spilar had been a successful sales person. Until June 17, 2004, Mr. Spilar had never been disciplined for alleged violations of Xerox's policies. Until June 17, 2004, Mr. Spilar had never received any feedback or notice from Xerox that he was not conducting himself in any manner inconsistent with Xerox Policy.

Xerox first violated Mr. Spilar's rights, and began its pattern of interference, intimidation, discrimination and refusal to grant, or even consider, a reasonable accommodation for Mr. Spilar in

September, 2001.  On August 30, 2001, Mr. Spilar suffered a heart attack and cardiac arrest.  This heart attack occurred during a workday.  As a result of this heart attack, Mr. Spilar ultimately spent eleven (11) days at the West Houston Medical Center.  Eight (8) of these days were spent in the Intensive Care Unit.  Consistent with his professional history and priorities, Mr. Spilar's first lucid thought after the heart attack and cardiac arrest was to call Xerox's Houston office from the Emergency Room to report that he had suffered a heart attack and cardiac arrest.  His purpose for calling Xerox was twofold: to let Xerox know that he would be absent from work due to illness, and to make sure that his customers were taken care of in his anticipated absence.

In the days that followed, Mr. Spilar was visited in the hospital by various Xerox personnel, including Xerox managers Mikel Nicks (his manager at that time), Laura Nine (his manager immediately prior to Mr. Nicks), Mike McGaha and Joe Lemoine, then Vice President of South Texas Sales Operations for Xerox.  Other Xerox managers and employees visited Mr. Spilar, including, but not limited to, Bob Neal, Troy Runyan and Rafael Figueroa.  It is clear that, on September 1, 2001, Xerox knew that Mr. Spilar had been hospitalized and was absent from work due to his illness, that on September 1, 2001, Xerox knew that Mr. Spilar was suffering from a serious medical condition, that on September 1, 2001, Mr. Spilar's initial disability was known to Xerox and that on September 1, 2001, Xerox knew that, if Mr. Spilar lived, it must accommodate Mr. Spilar's disability and provide him, in a non-discriminatory manner, the same benefits and accommodations that other employees in similar circumstances would enjoy.

In the forty-eight hours that followed the visits from Xerox and employees, Mr. Spilar went into cardiac arrest and "flatlines" on two (2) separate occasions.  Over the days following his surgery, Mr. Spilar was unable to communicate with Xerox's personnel due to his medication and a

tube in his throat.  Mr. Spilar eventually regained his ability to communicate and, as soon as

possible, checked in at work via telephone.  He wanted to tell Xerox that he was still in the hospital.

At that time, Mr. Spilar called his direct Xerox manager.  His direct Xerox manager, Mikel Nicks,

told him "…everything is O.K., I will get with you later…."  As stated above, eleven (11) days

after being admitted, Mr. Spilar was discharged from the hospital, on September 10, 2001, and sent

home to recover and begin rehabilitation as directed by his doctors.

Near the end of September, Mr. Nicks called Mr. Spilar at home to request his sales forecast

for the coming weeks and months.  Stunned, offended and intimidated, Mr. Spilar struggled to

provide feedback to his Mr. Nicks as he thought that the seriousness of his condition warranted

some time away from work.  He based this belief, primarily, on what his doctors had told him and

how he felt.

With Mr. Spilar in a weak and vulnerable state, and before he even had the opportunity to

absorb and understand Xerox's position, Mr. Nicks further announced to Mr. Spilar that he would

not be allowed to go on disability benefits and would stay on quota.  Mr. Nicks explained to Mr.

Spilar that to stay off of disability was a good thing for Mr. Spilar.  He told him that it would allow

him to make more money than he would on disability.  Mr. Nicks told Mr. Spilar to trust him

regarding his position on disability.  Since that time, in an effort to conceal its actions, Xerox has

taken the position that it was Mr. Spilar's decision to decline disability coverage.  It is apparent

from the record that the decision was made by Xerox.

One unsettling and telling example of Xerox attempting to excuse or hide its conduct after

the fact, is the misrepresentation within Xerox internal legal counsel's letter of August 18, 2004 to

the Equal Employment Opportunity Commission ("EEOC") regarding Mr. Spilar's disability status.

Xerox internal counsel's letter reads, in part, "Xerox admits that it was aware that Complainant

[Mr. Spilar] had had heart surgery, but denies that Complainant had subsequently requested any disability status or disability accommodation. In fact, Complainant declined to take time off to recuperate from his surgery, insisting on immediately returning to work." This representation is untrue and nonsensical and exhibits the lengths Xerox is willing to go to in an effort to hide its malicious and irresponsible conduct.

Mr. Spilar's first discussion regarding disability was with Mr. Nicks, weeks after his heart attack. According to Xerox policy, if Mr. Spilar declined disability benefits, as its counsel alleges, then he would have had to do so on September 1, the day after his heart attack and cardiac arrest, in order for Xerox's malicious course of action to conform with its contorted story. If he did not "declin[e] to take time off to recuperate", as Xerox internal counsel alleges, then Xerox policy dictates that the manager is to initiate the process for disability status for the employee. The manager is to initiate the process upon learning that the employee would miss work due to illness. Xerox knew that Mr. Spilar would miss work no later than September 1, 2001.

Mr. Spilar was in and out of consciousness, with tubes in his nose and throat and heavily medicated, while in the critical care unit of the hospital, *for a full eight (8) days after his heart attack*. Had Xerox followed its own policy, Mr. Spilar would have awakened on the 9th day enjoying disability status with his employer, or at the very least, Xerox would have already initiated the process of his going on disability.

Xerox did not lift a finger to initiate disability benefits for Mr. Spilar. Xerox did not want Mr. Spilar to go on disability because it feared he would become a long-term financial liability. Xerox saw what it perceived to be a useless, broken man whom it may be obligated to provide benefits to for a long time and was determined to keep Mr. Spilar from taking the route of

disability. For Xerox to come back now and say that Mr. Spilar, in these circumstances, rejected a benefit he was entitled to is untruthful, malicious and warrants punitive action.

The same letter from Xerox counsel includes page after page of Xerox Policy, emphasizing to the EEOC the importance of Xerox's policies and the insistence by Xerox that they be followed. Yet, Xerox ignored its policy in regard to Mr. Spilar's health and benefits. Xerox policies are only to be followed when convenient to Xerox, or to be used as a weapon against its employees, as was ultimately the case with Mr. Spilar.

Xerox policy is also plain and clear as to when a disability claim is to be initiated: "...when the employee informs you that he will be absent from work due to illness." On September 1, 2001, Xerox knew that Mr. Spilar would be absent from work due to illness. Xerox also knew that Mr. Spilar was in the hospital. Mr. Spilar had informed Xerox of such and members of Xerox's management had seen Mr. Spilar in the hospital themselves. The entire time Mr. Spilar was in the hospital, Xerox took no action regarding disability, disability status or disability accommodation for Mr. Spilar. After Mr. Spilar was released from the hospital, Xerox took no action regarding disability, disability status or disability accommodation for Mr. Spilar.

Xerox internal counsel's response to the EEOC infers that the employee has the sole responsibility to get disability assistance from Xerox, or an accommodation for a disability. This position is completely inconsistent with Xerox's own policy. This discriminatory application of Xerox policy and the refusal of benefits on the part of Xerox further exhibit the malice and wanton disregard Xerox has, and continues to exhibit, toward Mr. Spilar because he is disabled and a potential long term financial liability to Xerox.

Although Mr. Spilar was never on disability benefits, of any kind or at any time, with Xerox, from 2000 through September 2004, Xerox placed other employees with cardiovascular

related health problems on disability benefits. Ironically, Mr. Nicks, Mr. Spilar's immediate manager at the time of his first heart surgery, suffered a heart attack only months after Mr. Spilar's first heart attack. When Mr. Nicks had heart related health problems, Xerox immediately placed him on disability benefits. Xerox never considered putting Mr. Spilar on disability benefits. Mr. Nicks was not yet forty, a member of Xerox management, and worth trying to save. Conversely, Mr. Spilar was in his late 50s, had much more serious health problems, and was a dispensable sales representative.

The effect of Xerox's decision not to provide a disability benefit to Mr. Spilar, or an accommodation of an obvious disability, was to deny Mr. Spilar's legal rights, deny Mr. Spilar access to the same benefits of employment as other employees, e.g. Mr. Nicks, deny Mr. Spilar dignity, deny Mr. Spilar hope, deny Mr. Spilar self-esteem, deny Mr. Spilar an opportunity for peace of mind and to deny him an opportunity to recover from his debilitating disease and disability.

Mr. Spilar was effectively ordered back to work, without the opportunity to recover. As stated above, Xerox's course of action in regard to Mr. Spilar was contradictory to its own policies. Xerox ignored its policies because, in regard to Mr. Spilar, they were inconvenient and potentially expensive. Although Xerox's internal counsel attached voluminous Xerox policies to its response to the EEOC, counsel purposely chose not to disclose its policies regarding employee disability benefits to the EEOC. Xerox was fully aware of Mr. Spilar's circumstances but unwilling to follow its own policies. Instead, it made a deliberate, willful, cynical and malicious choice to discriminate, interfere and intimidate in regard to Mr. Spilar.

Xerox was intent on intimidating Mr. Spilar back to work. Xerox was intent on interfering with Mr. Spilar's legal rights and efforts to gain assistance and accommodation for his disability.

Mr. Spilar knew that his job with Xerox was all he had, and all he would ever have, in terms of employment with a company that provided the health benefits he now so desperately needed. Mr. Spilar knew that keeping his job would be difficult if not impossible. He was now nearly sixty (60) years old and disabled. Mr. Spilar had seen Xerox intimidate and mistreat older and weaker persons such as him. Mr. Spilar had seen Xerox set up people to fail and then feign surprise when the person did not perform. Mr. Spilar's work meant everything to him and Xerox knew it. Xerox's management knew Mr. Spilar would do whatever he was told and not argue the fairness or prudence of such demands. Mr. Spilar knew, based on what he had witnessed in his time at Xerox, if he challenged management about its decisions, Xerox would likely implement one of its innocuously named processes, e.g., the "Performance Improvement Process", and dismiss Mr. Spilar for reasons that were fabricated. This is a common practice at Xerox. Facing Xerox's discriminatory, irresponsible decision, Mr. Spilar was determined to keep his job despite his disability.

Although denied his rights by the intimidation and interference of Xerox, and completely taken advantage of by Xerox's management due to his weakened, vulnerable and desperate state, Mr. Spilar managed to perform his job duties, albeit to the detriment of his physical and mental health. At one of his lowest points in late 2001, because he was denied the obvious accommodation to rehabilitate, Mr. Spilar was forced to ask his elderly mother to drive him to meet with a Xerox client because he was too weak to operate his automobile safely.

Over the weeks and months that passed, because he was never allowed the opportunity to properly recover from his disability, Mr. Spilar's mental and physical health deteriorated. As a result, in February 2004, Mr. Spilar was ordered back for another heart surgery. Mr. Kelley, Mr.

Spilar's manager at this time, visited Mr. Spilar at the hospital after this second surgery. Mr. Nicks, now Manager of Sales Operations, visited at this time also. Xerox knew Mr. Spilar's condition.

Mr. Kelley and Mr. Spilar had been discussing the possibility of Mr. Spilar transferring to Dallas. Mr. Spilar wanted to find a place within Xerox that was less hostile and discriminatory to him. During this visit, Mr. Kelley and Mr. Nicks assured Mr. Spilar that they would work on getting him a transfer. There was no mention of a disability accommodation, despite the obvious need for an accommodation. The Xerox managers focused on getting Mr. Spilar out of Houston so that he would be someone else's problem in his terrible condition.

In February 2004, Xerox knew that Mr. Spilar had been hospitalized and was absent from work due to his illness, Xerox knew that Mr. Spilar was suffering from a serious medical condition and Ralph Kelley knew that Mr. Spilar had been hospitalized and was absent from work. Continuing the pattern of interference, intimidation and discriminatory conduct, Mr. Kelley did not initiate any effort to gain disability benefits status for Mr. Spilar, again, contrary to Xerox policy. Despite his illness and the days missed, and despite his discussions with Mr. Kelley and others regarding his precarious health situation, Mr. Kelley assured Mr. Spilar that Xerox would "…look out for you, [Mr. Spilar]…" and assured him that he and Xerox would act in Mr. Spilar's best interest.

During this time, Mr. Spilar talked openly and candidly with Mr. Kelley, other Xerox managers and numerous Xerox employees about the prescribed drugs he was taking, including, but not limited to Zoloft®. Within days after the second surgery, Mr. Spilar was told by his doctor that he needed another surgery, but it would likely kill him if the surgery were attempted. Mr. Spilar informed Mr. Kelley, other Xerox managers, and other Xerox employees that he was told by his doctor that he needed another surgery, but it would likely kill him if the surgery were attempted.

Mr. Spilar discussed with Ralph Kelley, other Xerox managers and employees his health concerns, the time and treatments that would be required, and the voluminous amount of drugs that he was taking in an attempt to stay alive and function. Mr. Spilar was, again, given assurances from Mr. Kelley that "...Xerox will take care of you." Mr. Kelley took no action regarding disability benefits for Mr. Spilar.

Despite Mr. Spilar's worsening disability, and now worsening relationship with Mr. Kelley, he pressed on. Mr. Spilar increased his medications, including his taking of Zoloft®. The depression that led to Mr. Spilar being prescribed Zoloft® was due to the increasingly hostile environment created by Xerox and Ralph Kelley. Mr. Kelley and others knew that Mr. Spilar had increased his prescribed medications and how it was affecting him.

By June of 2004, Mr. Kelley's actions and attitude toward Mr. Spilar had worsened to the point that Mr. Spilar knew he must take action to attempt to get in front of some more responsible and objective member of Xerox to discuss his job and health concerns. Mr. Kelley treated Mr. Spilar with hostility and disdain. Mr. Spilar was offended and troubled by Mr. Kelley's actions and attitude. He became increasingly worried that Mr. Kelley would take action to end his employment with Xerox because he was disabled. Mr. Kelley subjected Mr. Spilar to a higher degree of scrutiny than he did other, non-disabled employees. Mr. Kelley embarrassed Mr. Spilar in front of his peers and took satisfaction in doing so. Mr. Kelley was hateful and petty toward Mr. Spilar. Mr. Kelley's actions and attitudes told Mr. Spilar that Mr. Kelley viewed him as weak and less than a man.

On June 15, 2004, Mr. Spilar met with Mr. Kelley and Mr. Nicks to discuss work related matters. The subject of the meeting quickly turned to Mr. Spilar accepting a possible transfer to Dallas, where he hoped to find more responsible managers and a less hostile work environment.

In that meeting, due to concerns that he had, Mr. Spilar declined a transfer offered him by Mr. Kelley. Mr. Kelley became angry. Mr. Kelley told Mr. Spilar that he was "a liar" and that Mr. Spilar "had played him." Mr. Spilar then told Mr. Kelley that he wanted an "open door" meeting with Mr. Kelley's manager, William Collins. This request infuriated Mr. Kelley. Mr. Kelley was already under pressure from Mr. Collins due to his poor work performance. Mr. Collins himself was being scrutinized for his poor performance. The last thing Mr. Kelley and Mr. Collins wanted was this man, that they had such disdain and disrespect for, to use up their time, complain to them about management decisions, and possibly expose their lack of performance and poor decisions to further scrutiny. Furthermore, the same motivations that had caused Mr. Kelley to treat Mr. Spilar as he had in the last several months were the same for Mr. Collins: they each were performing poorly and they now had an employee that they knew was fragile and could go on disability at any time and that would only compound their performance problems. They were determined not to have Mr. Spilar be an impediment to them saving their own jobs.

Moments after the "open door" request, Mr. Kelley directed Mr. Spilar to leave the room and type a letter saying that he would not accept a transfer and wanted an "open door" meeting. Mr. Spilar, shaken from the confrontation, went to a desk in the Xerox bullpen and typed the letter demanded by Mr. Kelley.

The next day, June 16, 2004, Mr. Spilar had lunch with Mr. Nicks to discuss Mr. Kelley's attitude and conduct and his possible options to remedy the situation. Mr. Nicks was empathetic, wished Mr. Spilar well and told him everything would work out. On the afternoon of June 17, 2004, Mr. Spilar received a call on his cellular telephone from Mr. Kelley directing him to report to the office. Mr. Spilar came to the office where he was escorted by Mr. Kelley to a conference room and introduced to a person who identified himself only as Kevin Richman. After the brief

introduction, Mr. Kelley excused himself. Mr. Richman then began asking Mr. Spilar "How are you doing?" "How long have you been with Xerox?" "Tell me about your background?", etc.

After approximately fifteen (15) minutes of banter and small talk, Mr. Spilar asked Mr. Richman who he was. Mr. Richman identified himself as an investigator for Xerox. Mr. Richman then began discussing the allegations fabricated, or exaggerated, as a reason to fire Mr. Spilar. Mr. Spilar told Mr. Richman that if he had said something that offended someone, then he was sorry. He explained to Mr. Richman that he was a heart patient, was heavily medicated and that he had been under a great deal of stress due to Mr. Kelley's actions over the course of the year and his further failing health. Mr. Spilar told Mr. Richman that he needed a change from his current situation with Xerox and Mr. Kelley and hoped that Xerox would accommodate him. Shortly thereafter, Mr. Richman informed Mr. Spilar that he was "on suspension until further notice", escorted him to his desk, escorted him to the elevators and directed Mr. Spilar to leave the premises. Mr. Spilar did not know what was happening.

When word got out that Xerox had suspended Mr. Spilar, he received many calls from many Xerox employees wishing him well and urging him to take care of his health because they all knew, as most within Xerox did, that Mr. Spilar had been ill for some time. One Xerox employee told Mr. Spilar that Mr. Nicks had told him during the suspension that Mr. Spilar "should have been on disability."

On June 27, 2004, Mr. Spilar sent a letter and supporting documentation, via hand delivery, to Mr. Collins attention at Xerox, and the same package, via the United States Postal Service, to the Xerox investigator, apologizing for whatever it was he was being accused of and further trying to address his concerns about his health and request an accommodation to address his disability. Xerox ignored his request for a reasonable accommodation for his disability. In the three (3) days

that followed, Mr. Spilar communicated with Mr. Richman, the investigator, regarding the letter and supporting documentation. Mr. Collins was silent.

Between June 27 and midday June 30, Mr. Spilar's counsel spoke to Mr. Kelley regarding Mr. Spilar's situation three (3) times. Counsel had called Mr. Collins but Mr. Collins had refused his call. On June 30, 2004, Mr. Kelley called counsel for Mr. Spilar, at counsel's request, and asked that Mr. Spilar report to a Xerox conference room without counsel. Counsel asked Mr. Kelley if he could be present and Mr. Kelley told him that he could not. Mr. Spilar reported to the conference room where he was informed that his employment with Xerox was terminated without explanation. Mr. Spilar left the meeting and joined legal counsel in the parking lot. Upon seeing Mr. Spilar, counsel directed him to sit down and call his doctor immediately. Mr. Spilar called his doctor and told her what had happened. Mr. Spilar's doctor then sent a letter to Xerox, via facsimile, further attempting to impress upon Xerox the seriousness of Mr. Spilar's health problems and disability and request an accommodation for Mr. Spilar. Xerox did not respond to the doctor's letter.

In a final show of malice and callous disregard for Mr. Spilar's rights, exhibiting the hair-splitting and "gotcha" attitude of Xerox, its internal counsel acknowledged in its response to the EEOC that it had received a communication regarding Mr. Spilar's disability and the doctor's concerns, however "...the letter from Complainant's physician...is dated June 30, 2004, the date of Complainant's termination. This letter was faxed to Xerox and received at 5:10 p.m. on June 30. This letter was clearly after the fact – Xerox had completed Complainant's termination...." In exhibiting knowledge of the finer details of this matter, Xerox's internal counsel imputes that a reasonable accommodation for Mr. Spilar should have been considered, had one been requested in a timely manner. Reasonable accommodations were requested, and obviously necessary, before

Mr. Spilar's termination. Xerox knew that. Xerox's internal counsel did not know that, or chose to ignore it when responding to the EEOC.

It was not until Mr. Spilar read Xerox's response to his EEOC complaint that he realized the lengths Mr. Collins, Mr. Kelley and Xerox had gone to in order to fire him due to his disability. The Xerox response had accused Mr. Spilar of threatening to shoot someone at work. Mr. Spilar did not threaten anyone in any manner. Mr. Spilar was well liked and respected and he always treated everyone that he worked with in a friendly and respectful manner.

After the wrongful termination, Mr. Spilar received numerous calls from those he had worked with saying how sorry they were about what had happened and the setup by William Collins and Ralph Kelley to get rid of him due to his disability.

In a letter to Mr. Collins requesting Mr. Spilar's immediate termination, Mr. Kelley described Mr. Spilar's alleged behavior as "intimidating and menacing to [Xerox] employees" and that such alleged behavior "may lead to psychological harm." Mr. Kelley knew that what he was writing was not true. No employee had been examined by a doctor to determine if she may suffer from "psychological harm." In addition, if he believed the allegations to be true, he would never have invited Mr. Spilar back to the facility on two (2) occasions: once to be suspended and again to be fired. If Mr. Spilar were the dangerous character portrayed by Mr. Kelley and Mr. Collins, and anyone within Xerox believed that, Mr. Spilar would have never been allowed back on the premises. In fact, each time he came back to the Xerox facility, he was carrying a brief case. If sincere in his or her belief that Mr. Spilar was dangerous, no sensible person would have allowed this. Finally, the alleged "intimidating and menacing" behavior happened *eight (8) days prior to anyone saying anything about it.* It only became "intimidating and menacing" when it could be used to as a pretext to fire Mr. Spilar. Tellingly, no mention or consideration is made or given

regarding Mr. Spilar's behavior during the eight (8) days between the alleged behavior and the firing. It is not mentioned because nothing happened. The ladies that complained; Susan Jernigan, Kristi Kaplavka and Blanco Orosco, worked with and interacted with Mr. Spilar for several days thereafter, without incident. In fact, the day Mr. Spilar was called in and bushwhacked by Mr. Kelley and Mr. Collins, Susan Jernigan saw Mr. Spilar and gave him a big smile, wave and "hello, Bob!"

As further evidence that no reasonable, objective person believed that Mr. Spilar had done what he was accused of having done, or was dangerous and unstable, the evening that he was fired, Xerox employees joined him at a restaurant next door to check on him and tell them that they were sorry for what happened. In the days that followed, Mr. Spilar received numerous calls and condolences. All knew how important his job was to him. All knew the reality Mr. Spilar now faced: he was damaged goods and might never find employment with benefits again. All suspected that something inherently unfair had happened. Teresia Perry and Maureen Battle, two (2) Xerox employees that had worked with Mr. Spilar daily before his wrongful termination took him to lunch. They knew that the accusations, fabricated or exagerrated by Xerox were untrue. They were not afraid of Mr. Spilar. They did not have the agenda that Xerox, William Collins and Ralph Kelley had. No one at Xerox had any basis to believe that Mr. Spilar would hurt anyone. This claim was a pretext to fire Mr. Spilar. Mr. Spilar was fired because he was disabled and there was a very real possibility that he could become a long-term financial liability to Xerox and a liability to Mr. Kelley and Mr. Collins by being out of the field, and not selling, if his fragile health did not hold out.

Mr. Kelley and Mr. Collins were determined to fire the useless, broken down old man that had dared to defy them. How dare him ask for a meeting with Mr. Collins. They were determined

that this man would not go on disability and leave them with an empty sales territory and the obligation to pay for his health care going forward. They were determined that Mr. Spilar would not have the opportunity to potentially embarrass them, expose their incompetence and draw more focus to their poor performances. Mr. Collins and Mr. Kelley were already being scrutinized for their lack of performance. Mr. Kelley and Mr. Collins would teach this man a lesson and make sure this disabled man would work at his last job.

As a sad postscript to the machinations of Mr. Kelley and Mr. Collins, Mr. Kelley signed Mr. Collins name to the paperwork that required Mr. Collins' signature to terminate Mr. Spilar. Mr. Collins had such little respect and complete and utter disdain for this disabled man, that he did not even bother to take the time to sign his name to the whole sordid thing. This disabled man did not deserve any of his important time.

**WILLFUL VIOLATIONS OF CHAPTER 21
OF THE TEXAS LABOR CODE**

Mr. Spilar repeats and realleges each and every Paragraph of this Petition as though fully set forth herein.

At all times relevant herein, Xerox was an "employer" and Mr. Spilar was an "employee" under Chapter 21 of the Texas Labor Code.

At all relevant times herein, Chapter 21 of the Texas Labor Code guaranteed Mr. Spilar a right to be free of discrimination based upon any disability, perceived disability or record of disability.

At all relevant times, Mr. Spilar was a "qualified person with a disability" under the Texas Labor Code due to his disability, record of a disability and/or due to Xerox's perception that he was disabled.

Xerox became aware of Mr. Spilar's disability and record of a disability.

Xerox violated Mr. Spilar's civil rights by discriminating against him on the basis of his disability, history of disability and/or perceived disability in the following respects:

a.    Denying Mr. Spilar the same privileges and benefits of employment that it provided other employees with the same or substantially similar disability in regard to an accommodation and disability benefits.

b.    Denying Mr. Spilar an accommodation and disability benefits for his disability/disabilities in a discriminatory manner.

c.    Denying Mr. Spilar reasonable accommodation for his known disability/disabilities.

d.    Denying Mr. Spilar reasonable accommodation for his perceived disability/disabilities.

e.    Interfering with Plaintiff's ability to receive an accommodation or benefits for his disability.

f.    Coercing Mr. Spilar in regard to his benefits or an accommodation for his disability/disabilities.

g.    Intimidating Mr. Spilar in order to dissuade him from seeking an accommodation or benefits for his disability/disabilities.

h.    Harassing of Mr. Spilar due his known disability/disabilities in a manner sufficient to offend him and inhibit his ability to perform at work.

i.    Harassing of Mr. Spilar due his perceived disability/disabilities in a manner sufficient to offend him and inhibit his ability to perform at work.

j.    Refusing to consider a reasonable accommodation for his known disability/disabilities.

k.    Refusing to consider a reasonable accommodation for his perceived disability/disabilities.

l.    Terminating his employment without considering his request for a reasonable accommodation.

m.    Harassing him in order to force him to terminate his employment.

n.    Otherwise discriminating against him with respect to the terms, conditions and privileges of employment because of his disability, history of disability and/or perceived disability.

Xerox's violation was willful.

As a direct and proximate result of Xerox's violations of the Texas Labor Code, Mr. Spilar has suffered damages, including but not limited to loss of past and future income and fringe benefits, loss of professional reputation, mental anxiety and emotional distress.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Mr. Spilar repeats each and every Paragraph of this Petition as though fully set forth herein.

Xerox's, Mr. Collins' and Mr. Kelley's conduct as set forth and described in this Petition constitutes extreme and outrageous conduct which intentionally and/or recklessly caused and continues to cause Mr. Spilar's severe emotional distress.

Such conduct by Xerox, Mr. Collins and Mr. Kelley was so outrageous and extreme as to be regarded as atrocious and to go beyond all possible bounds of decency, and to be utterly intolerable in a civilized community and work setting.

As a direct and proximate result of such Intentional Infliction of Emotional Distress, Mr. Spilar's has suffered damages, including but not limited to loss of past and future income and fringe benefits, loss of professional reputation, mental anxiety and emotional distress.

### JURY DEMAND

Mr. Spilar hereby demands a jury trial on all issues that can be submitted to a jury.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Robert Spilar, respectfully prays that:

Mr. Spilar recover his actual damages, statutory damages and punitive damages in an amount to be determined by a jury at trial;

Mr. Spilar recover his reasonable attorneys' fees;

Mr. Spilar recover his expenses and costs of court; and